1  Matthew C. Bernstein, Bar No. 199240
   MBernstein@perkinscoie.com
2  PERKINS COIE LLP
   1888 Century Park E., Suite 1700
3  Los Angeles, CA 90067
   Telephone:  310.788.9900
4  Facsimile:  310.788.3399

5  Patrick J. McKeever, Bar No. 268763
   PMcKeever@perkinscoie.com
6  PERKINS COIE LLP
   11452 El Camino Real, Suite 300
7  San Diego, CA  92130-2594
   Telephone:  858.720.5700
8  Facsimile:  858.720.5799

9  Attorneys for Defendant
   ROKU, INC.

10                    UNITED STATES DISTRICT COURT

11                    CENTRAL DISTRICT OF CALIFORNIA

12                    (SOUTHERN DIVISION - SANTA ANA)

13

14
   UNILOC 2017 LLC,                    Case No. 8:19-cv-00295-JVS-DFMx
15
                  Plaintiff,           **DEFENDANT ROKU, INC.'S**
16                                     **NOTICE OF MOTION AND**
                                       **MOTION TO DISMISS FIRST**
17        v.                           **AMENDED COMPLAINT;**
                                       **MEMORANDUM OF POINTS AND**
18  ROKU, INC.,                        **AUTHORITIES IN SUPPORT**
                                       **THEREOF**
                  Defendant.
19
                                       Date:      April 15, 2019
20                                     Time:      1:30 p.m.
                                       Judge:     Hon. James V. Selna
21                                     Courtroom:    10C
22
                                       Amended Complaint Filed: March 8,
23                                     2019

24

25

26

27

28

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2   Please take notice that on April 15, 2019 at 1:30 p.m., or as soon thereafter as

3 counsel may be heard, in the Courtroom of the Honorable James V. Selna, 411

4 West Fourth Street, Courtroom 10C, Santa Ana, CA 92701, Defendant Roku, Inc.

5 ("Roku"), by and through its attorneys, will and hereby does move this Court to

6 dismiss Plaintiff Uniloc 2017 LLC's First Amended Complaint for failure to state a

7 claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

8   This Motion is made following the conference of counsel pursuant to Local

9 Rule 7-3, which took place on March 7, 2019.

10

11 DATED:  March 18, 2019    **PERKINS COIE LLP**

12

13          By: */s/ Patrick J. McKeever*
            Patrick J. McKeever

14            PMcKeever@perkinscoie.com

15           Attorneys for Defendant
            ROKU, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ..................................................................................... 1

II.  FACTUAL BACKGROUND .................................................................... 2

III. LEGAL STANDARDS ............................................................................ 2

    A.   Dismissal Under Rule 12(b)(6) ...................................................... 2

    B.   Ineligible Subject Matter Under 35 U.S.C. § 101 .......................... 3

IV.  ARGUMENT ........................................................................................... 5

    A.   The '609 Patent Claims Patent-Ineligible Subject Matter ............. 5

        1.   The '609 Patent is Directed to an Abstract Idea ...................... 6

        2.   The '609 Patent Lacks an Inventive Concept ........................... 7

        3.   Uniloc Has Failed to Plead Facts Sufficient to Defeat a
            Motion to Dismiss the '609 Patent ........................................ 10

    B.   The '118 Patent Claims Patent-Ineligible Subject Matter ........... 12

        1.   The '118 Patent is Directed to an Abstract Idea .................... 13

        2.   The '118 Patent Lacks an Inventive Concept ......................... 14

        3.   Uniloc has Failed to Please Facts Sufficient to Defeat a
            Motion to Dismiss the '118 Patent ........................................ 17

    C.   The '005 Patent Claims Patent-Ineligible Subject Matter ........... 17

        1.   The '005 Patent is Directed to an Abstract Idea .................... 18

        2.   The '005 Patent Lacks an Inventive Concept ......................... 21

        3.   Uniloc Fails to Plead Facts Sufficient to Defeat a Motion
            to Dismiss the '005 Patent .................................................... 23

        4.   The '005 Patent Preempts All Ways of Achieving
            Concurrent Motion Estimation .............................................. 25

V.   CONCLUSION ...................................................................................... 25

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*3G Licensing, S.A. v. Blackberry Ltd.*,
5
    302 F. Supp. 3d 640 (D. Del. 2018) ................................................................. 13

6

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
7
    838 F.3d 1253 (Fed. Cir. 2016) .......................................................... passim

8

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
9
    573 U.S. 208 (2014) ............................................................................ passim

10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................ 2, 3, 12, 17
11

12

*Automated Tracking Sols., LLC v. Coca-Cola Co.*,
    723 F. App'x 989 (Fed. Cir. 2018) .............................................................. 4

13

*Bell Atlantic Corp. v. Twombly*,
14
    550 U.S. 544 (2007) ..................................................................................... 2

15

*BSG Tech LLC, v. Buyseasons, Inc.*,
16
899 F.3d 1281 (Fed. Cir. 2018) ...................................................................21

17

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
18
    316 F. Supp. 3d 1138 (N.D. Cal. 2018) ...................................................... 4

19

*Cellular Commc'ns Equip. LLC v. AT & T Inc.*,
    No. 2:15-cv-00576-RWS-RSP, 2017 WL 2984074 (E.D. Tex. June
20
    27, 2017) ...................................................................................................... 5

21

22

*Clarilogic, Inc. v. FormFree Holdings Corp.*,
    681 Fed. App'x 950 (Fed. Cir. 2017) ........................................................21

23

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
24
    859 F.3d 1352 (Fed. Cir. 2017) ................................................. 4, 14, 23

25

*Consumer 2.0, Inc. v. Tenant Turner, Inc.*,
26
    343 F. Supp. 3d 581 (E.D. Va. 2018) .......................................................... 5

27

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
28
    776 F.3d 1343 (Fed. Cir. 2014) ................................................................... 4

**TABLE OF AUTHORITIES**
(continued)

Page

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ..................................................... 13, 14

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) ................................................. 3, 19, 21

*Fayer v. Vaughn*,
    649 F.3d 1061 (9th Cir. 2011) ....................................................... 3, 12

*Genetic Techs. Ltd. v. Merial L.L.C.*,
    818 F.3d 1369 (Fed. Cir. 2016) ............................................................ 4

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ............................................................. 7

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017) ...................................................... 7, 16

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016) ......................................................... 24

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) ........................................................... 3

*Le Roy v. Tatham*,
    55 U.S. 156 (1852) .......................................................................... 25

*Maxell, Ltd. v. Fandango Media, LLC*,
    No. CV 17-07534 AG, 2018 WL 4502492 (C.D. Cal. Sept. 11,
    2018) ................................................................................................ 4

*Maxon, LLC v. Funai Corp.*,
    726 F. App'x 797 (Fed. Cir. 2018) ..................................................... 4

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) .......................................................... 3, 16, 22, 23

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008) ............................................................ 2

-iii-

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

4

*OIP Techs. Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ........................................................ 4, 8

5

6

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
    855 F.3d 1322 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 672 (2018) 12, 13, 14, 17

7

8

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018) ..................................................... 24, 25

9

*Secure Mail Sols. LLC v. Universal Wilde, Inc.*,
    169 F. Supp. 3d 1039 (C.D. Cal. 2016) ................................................ 4

10

11

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016) ........................................................ 11

12

13

14

*TriPlay, Inc. v. WhatsApp Inc.*,
    C.A. No. 13–1703–LPS–CJB, 2018 WL 1479027 (D. Del. Mar. 27,
    2018) ........................................................................................... 5

15

16

*TS Patents LLC v. Yahoo! Inc.*,
    731 F. App'x 978 (Fed. Cir. 2018), *petition for reh'g en banc
    denied*, No. 2017-2625 (Fed. Cir. Sept. 25, 2018) ............................... 4

17

18

*Two-Way Media Ltd. v. Comcast Cable Commc'ns*, *LLC*,
    874 F.3d 1329 ................................................................... 11, 19, 20

19

20

*Uniloc USA, Inc. v. HTC Am., Inc.*,
    No. C17-1558JLR, 2018 WL 3008870 (W.D. Wash. June 15, 2018) 5, 12, 17, 24

21

22

*Voit Techs., LLC v. Del-Ton, Inc.*,
    No. 2018-1536, 2019 WL 495163 (Fed. Cir. Feb. 8, 2019) ............... 12

23

**STATUTES**

24

35 U.S.C. § 101 ........................................................................... passim

25

**OTHER AUTHORITIES**

26

Fed. R. Civ. P. 12(b)(6) ............................................................... 2, 4

27

28

-iv-

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In 2014, the Supreme Court clarified the law of patent eligibility in *Alice Corporation v. CLS Bank*, holding that an abstract idea implemented on a general-purpose computer is not eligible for a patent under 35 U.S.C. § 101.  Since that time, courts across the nation have invalidated scores of patents for failing to pass muster under *Alice*.  The *Alice* test requires two steps:  first, the claims of the patent are analyzed to determine whether they are directed to an abstract idea.  If so, the claims are then analyzed to determine whether they contain an inventive concept that transforms the claims into a patent-eligible application.  The Uniloc patents at issue in this motion fail both 4steps and are thus ineligible.

The '609 patent claims the concept of timing elapsed media playback.  People have been timing events since Galileo timed his pendulum, and timing media playback instead of pendulums is no different.  To this abstract idea, Uniloc adds only conventional computer functionality, such as measuring the time with a generic program, transmitting timing data across a network, and storing the data for later retrieval.  These conventional features do not constitute an inventive concept, and the '609 patent is thus ineligible for patenting.

The '118 patent is directed to encoding and decoding image data, something the Federal Circuit has already deemed abstract.  The '118 patent claims a method that consists of two processing steps that are admittedly known and a third step that requires only the use of admittedly "conventional" resynchronization markers.  The claims of the '118 patent include no inventive concept and are thus patent-ineligible.

The '005 patent is directed to the abstract idea of concurrent motion estimation.  Making matters worse, the '005 patent attempts to cover all possible ways of accomplishing concurrent motion estimation rather than any purportedly inventive approach described in the patent.  The claims of the '005 patent are thus

1    drawn to the abstract idea itself and are patent-ineligible.

2         Uniloc recently filed an amended complaint which imports additional

3    statements from the patent specifications and makes bald assertions as to inventive

4    concepts that persons of ordinary skill in the art would recognize in the patents.  No

5    amount of conclusory legal allegations can generate an inventive concept where

6    none actually exists in the patent claims, however, and Uniloc's allegations do not

7    make the claims patent eligible.

8    ## II.    FACTUAL BACKGROUND

9         Uniloc filed this lawsuit on February 14, 2019, accusing Roku of infringing

10   U.S. Patent Nos. 8,407,609 (the "'609 patent"); 6,895,118 (the "'118 patent"); and

11   6,519,005 (the "'005 patent").  McKeever Decl., Ex. C ('609 patent); Ex. D ('118

12   patent); Ex. E ('005 patent).  Uniloc filed an amended complaint on March 8, 2019.

13   McKeever Decl., Ex. B ("FAC").  The Complaint alleges Roku infringes at least

14   claim 1 of the '609 patent by measuring and storing the time that a user watches a

15   video.  FAC ¶¶ 77-104.  It alleges that Roku infringes at least claim 1 of the '118

16   and '005 patents by encoding video in a manner that is compliant with the H.264

17   standard.  *Id.* ¶¶ 46-76 ('118), ¶¶ 8-45 ('005).

18   ## III.   LEGAL STANDARDS

19   ### A.    Dismissal Under Rule 12(b)(6)

20        Dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper where a

21   complaint lacks (1) a cognizable legal theory or (2) sufficient facts to support a

22   cognizable legal theory.  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097,

23   1104 (9th Cir. 2008).  Under the heightened pleading standards of *Bell Atlantic*

24   *Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009),

25   a plaintiff must allege "enough facts to state a claim to relief that is plausible on its

26   face."  *Twombly*, 550 U.S. at 570.  Labels, conclusions, and "a formulaic recitation

27   of the elements of a cause of action will not do."  *Id.* at 555.  Similarly, courts "are

28   not bound to accept as true a legal conclusion couched as a factual allegation."

-2-

1    *Iqbal*, 556 U.S. at 678; *see also Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir.

2    2011) (Courts need not "assume the truth of legal conclusions merely because they

3    are cast in the form of factual allegations.").

### B.    Ineligible Subject Matter Under 35 U.S.C. § 101

5           Valid patents may be issued only for a "new and useful process, machine,

6    manufacture, or composition of matter, or any new and useful improvement

7    thereof."  35 U.S.C. § 101.  Laws of nature, natural phenomena, and—importantly

8    for this case—abstract ideas are not patentable.  *Mayo Collaborative Servs. v.*

9    *Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012); *Alice Corp. Pty. Ltd. v. CLS Bank*

10   *Int'l*, 573 U.S. 208, 216 (2014).

11          In *Alice*, the Supreme Court outlined a two-prong framework for determining

12   whether claimed subject matter is patentable under § 101.  573 U.S. at 217-18

13   (citing *Mayo*, 566 U.S. at 77-79).  At step one, the court determines whether a claim

14   is directed to an abstract idea.  *Id.* at 217.  To make this first determination, courts

15   consider the "focus" or "basic character" of the claims.  *See Elec. Power Grp., LLC*

16   *v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016); *Internet Patents Corp. v.*

17   *Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015).

18          If the claims are found to be directed to an abstract idea, the second step

19   requires determining whether the claims include an "inventive concept," that is,

20   some additional element or combination of elements "sufficient to ensure that the

21   patent in practice amounts to significantly more than a patent upon the [ineligible

22   concept] itself."  *Alice*, 573 U.S. at 217-18 (quoting *Mayo*, 566 U.S. at 72-73)

23   (alterations in original).  In *Alice*, the Supreme Court explained that "wholly

24   generic computer implementation is not generally the sort of 'additional featur[e]'

25   that provides any 'practical assurance that the process is more than a drafting effort

26   designed to monopolize the [abstract idea] itself.'"  *Id.* at 223-24 (quoting *Mayo*,

27   556 U.S. at 77) (alterations in original).  If the claims lack an inventive concept

28   "sufficient to 'transform' the claimed abstract idea into a patent-eligible

-3-

application," they are patent-ineligible and invalid under § 101.  *Id.* at 221 (quoting *Mayo*, 556 U.S. at 72, 79).

Where the claims of a patent are substantially similar and linked to the same abstract idea, courts may focus on a representative claim.  *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017); *Maxell, Ltd. v. Fandango Media, LLC*, No. CV 17-07534 AG (SSx), 2018 WL 4502492, at *3 (C.D. Cal. Sept. 11, 2018).

Patent eligibility under 35 U.S.C. § 101 is a question of law that may be addressed through a Rule 12(b)(6) motion.  *See, e.g.*, *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016); *Secure Mail Sols. LLC v. Universal Wilde, Inc.*, 169 F. Supp. 3d 1039, 1045 (C.D. Cal. 2016).  When a complaint asserts a patent directed to ineligible subject matter, it fails to state a plausible claim for relief and should be dismissed.  *See, e.g.*, *OIP Techs. Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1345 (Fed. Cir. 2014).

Although patent eligibility "may contain underlying questions of fact," district courts have dismissed cases under § 101 and the Federal Circuit has affirmed ineligibility rulings at the pleadings stage.  *Automated Tracking Sols., LLC v. Coca-Cola Co.*, 723 F. App'x 989, 992, 995 (Fed. Cir. 2018) (affirming grant of judgment on the pleadings of patent ineligibility because the complaint and specification failed to support the contention that the patent involved a developing technology instead of well-understood, routine, and conventional systems); *see also Maxon, LLC v. Funai Corp.*, 726 F. App'x 797, 798 (Fed. Cir. 2018) (affirming the district court's dismissal of the case after finding the asserted patents invalid under § 101); *TS Patents LLC v. Yahoo! Inc.*, 731 F. App'x 978, 979 (Fed. Cir. 2018) (same), *petition for reh'g en banc denied*, No. 2017-2625 (Fed. Cir. Sept. 25, 2018); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 316 F. Supp. 3d 1138, 1153-54 (N.D. Cal. 2018) (granting motion to dismiss because patentee's assertion of the inventiveness

-4-

of the claimed technology was unsupported by the specification); *Uniloc USA, Inc. v. HTC Am., Inc.*, No. C17-1558JLR, 2018 WL 3008870, at *9 (W.D. Wash. June 15, 2018) ("Simply stating that the claimed method and systems were not conventional at the time of the patent application does not make it so, and the court need not credit such conclusory statements.").  Importantly, a patentee cannot manufacture an "inventive concept" that the inventors did not recognize and disclose in the patent specification.  *See, e.g.*, *TriPlay, Inc. v. WhatsApp Inc.*, C.A. No. 13–1703–LPS–CJB, 2018 WL 1479027, at *11 (D. Del. Mar. 27, 2018) (granting motion to dismiss where specification did not disclose function of allegedly inventive concept or its advantage over prior art); *Consumer 2.0, Inc. v. Tenant Turner, Inc.*, 343 F. Supp. 3d 581, 593 (E.D. Va. 2018) ("[I]t is not evident from the '590 patent specifications that there is any inventive feature used in an unconventional manner."); *Cellular Commc'ns Equip. LLC v. AT & T Inc.*, No. 2:15-cv-00576-RWS-RSP, 2017 WL 2984074, at *4 n.1 (E.D. Tex. June 27, 2017) (rejecting argument that a feature was inventive where the specification did not "reflect such an insight" or explain how the feature was an advance over prior art).

## IV.  ARGUMENT[1]

### A.  The '609 Patent Claims Patent-Ineligible Subject Matter

The '609 patent claims the abstract idea of "measuring elapsed time."  To implement this idea, the '609 patent claims the use of an "applet"—a generic program—that measures how long the user has been watching a video and transmits data about the elapsed time across the Internet to a remote general-purpose computer, which stores the elapsed time.  Because the '609 patent uses routine and conventional computer functions to implement its abstract idea, it is ineligible for patent protection.

---

[1] For the Court's benefit, Roku notes that the patent-specific arguments herein are substantially similar to those included in the Hulu and Netflix motions to dismiss filed on March 18, 2019.

The '609 patent issued on March 26, 2013 with one independent claim and two dependent claims.  It describes the purported invention as a method for using a timer applet to track a user's streaming of a "digital media presentation" displayed on a web page.  '609 patent at 2:14-34 ("Summary of the Preferred Embodiments").  The purported utility of the claimed subject matter is in the data collected from tracking the user, which the patent alleges "allows for an increasing scale of payments for advertising displayed on a given page correspondent to how long a viewer or viewers remain, or typically remain, on that particular page or like pages."  *Id*. at 7:49-50.  Notably, the claims are silent as to this alleged benefit.

Claim 1, the '609 patent's only independent claim, is representative.  *See* McKeever Decl., Ex. A (hereinafter, "Claim Listing") at 1.

### 1.     The '609 Patent is Directed to an Abstract Idea

Measuring elapsed time is an ancient concept.  Historical records in athletic contests, such as the fastest person to run a mile, have been kept since the mid-1800s, when timekeepers would record the measurements by hand.  Even measuring and recording elapsed media playback time—which is all that Uniloc claims—remains old.  VCRs had timers that showed how long viewers were watching videotapes.  Home-recordable videotape labels contained multiple lines for users to note start and stop times for programs and access them more easily.

When audiovisual content reached the digital realm, people still timed playback:  a timer display on a CD player or laserdisc player measured and told the user how much time had been spent listening to music or watching movies.  When general purpose computers began to serve as media centers, the media programs—such as Windows Media Player or Apple QuickTime—timed user playback of local media, such as songs and videos.  The '609 patent claims only this concept.

Measuring elapsed time is a fundamentally abstract idea.  Measuring elapsed time of a generic technology—digital media presentations, *i.e.*, video—or within a generic technological environment—such as one requiring sending, receiving, and

-6-

storing the measurements—is insufficient to make the claims non-abstract.  *E.g.*, *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1330 (Fed. Cir. 2017) ("[A]s we have previously observed, an abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the Internet.") (citation and internal quotation marks omitted); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612-13 (Fed. Cir. 2016) (storing data in organized manner held abstract).

### 2.   The '609 Patent Lacks an Inventive Concept
#### a.   Claim 1

Nothing in the limitations of claim 1, viewed individually or as an ordered combination, provides an inventive concept sufficient to transform the abstract idea into a patent-eligible invention.  The crux of the '609 patent is the use of a generic timing program to measure elapsed time viewing a program, and then receiving and recording the resulting data.  This is nothing more than implementing an ancient human practice into a generic computer environment, and it is accordingly ineligible for patenting.  "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

The Federal Circuit's decision is *Ultramercial, Inc. v. Hulu, LLC* is squarely on point.  772 F.3d 709 (Fed. Cir. 2014).  The *Ultramercial* court analyzed an eleven-element claim, also coincidentally related to monetizing viewable content, that included the steps of:

> (1) receiving copyrighted media from a content provider; (2) selecting an ad after consulting an activity log to determine whether the ad has been played less than a certain number of times; (3) offering the media for sale on the Internet; (4) restricting public access to the media; (5) offering the media to the consumer in exchange for watching the selected ad; (6) receiving a request to view the ad from the consumer;

(7) facilitating display of the ad; (8) allowing the consumer access to the media; (9) allowing the consumer access to the media if the ad is interactive; (10) updating the activity log; and (11) receiving payment from the sponsor of the ad.

*Id.* at 712.

Despite the "degree of particularity" added by some of the limitations—something absent from the '609 patent claims—the Federal Circuit nevertheless found the claim unpatentable as abstract and non-inventive. *Id.* at 717. Most of the steps were directed to the abstract idea of "showing an advertisement before delivering free content," and the remaining steps were either "insignificant data-gathering steps" (such as consulting and updating an activity log) or "insignificant pre-solution activity" (such as restricting public access). *Id.* at 715-16. Moreover, the steps were "not tied to any particular novel machine or apparatus, only a general purpose computer." *Id.* at 716.

Just as in *Ultramercial*, claim 1 of the '609 patent recites an abstract idea along with a host of limitations requiring insignificant and conventional activities for practicing the idea, all of which are performed with general-purpose computers. *See* Claim Listing at 1. The system: (1) sends a webpage that causes a digital media presentation to be streamed (elements [a], [f]); (2) sends identifying data to the user's computer to allow the timed user to be identified by the system (element [b]); (3) sends a timing applet to the user's computer (element [c]); (4) receives identifying data from the user's computer at periodic intervals (element [d]); (5) stores the received data, all of which together indicates how long the user viewed the digital media presentation (elements [e], [g], [h]). The use of webpages, streaming video, transmitting data, running an applet, receiving data, and storing data: every one of these elements is a conventional computer activity or a routine data-gathering step and thus cannot constitute an inventive concept. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (where claims

recited "well-understood, routine conventional activit[ies]," either by requiring conventional computer activities or routine data-gathering steps … the claim elements fail "to 'transform' the claimed abstract idea into a patent-eligible application") (citing *Alice*, 134 S. Ct at 2359, 2357).  The transfer of data between computers to implement the abstract idea of timing elapsed media playback is simply not inventive.  *Ultramercial*, 772 F.3d at 717 ("[T]he transfer of content between computers is merely what computers do and does not change the analysis.").

Notably, the '609 patent concedes that the majority of its limitations are conventional.  *See, e.g.*, '609 patent at 5:22-25 (streaming and downloading data to a webpage are conventional), 7:38-41 (multiple types of identifier data are known and conventional), 12:1-5 (streaming and downloading video is conventional).  Storing data "indicative of an amount of time the digital media presentation data is streamed" ('609 patent at 14:40-45) is substantively similar to the "updating an activity log" step that the Federal Circuit held was an "insignificant data-gathering step . . . add[ing] nothing of practical significance to the underlying abstract idea" and thus non-inventive.  *Ultramercial*, 772 F.3d at 716; *see also Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) (generic storing and transmitting limitations did not provide an inventive concept).  As for the timing "applet," not only does the specification fail to describe it as inventive, but it fails to provide any direction as to how it would be implemented, simply assuming that the skilled artisan would already understand how to do so.  *See, e.g.*, '609 patent at 12:67-13:4 ("'Applet,' as used herein, generally refers to a software component that runs in the context of another program, in the case of page 900 of FIG. 9, a web browser. Such an applet may typically used [*sic*] to perform a specific function or task, usually narrow in scope.").

### b.   Claims 2 & 3

Claims 2 and 3 fare no better than Claim 1.  Claim 2 adds to claim 1 the

-9-

requirement that "storing comprises incrementing a stored value dependently upon the receiving."  "Incrementing" is nothing more than "adding" and is a fundamental, routine, and conventional operation whether performed by a human or a general-purpose computer.  The claimed "incrementing" thus adds nothing non-abstract or non-conventional to the claim.

Claim 3 then adds to claim 2 that "the received data is indicative of a temporal cycle passing."  The specification does not define a "temporal cycle," but it does make clear that the timing applet can periodically send data to the server, after which "a value indicative of the number of cycles that have passed in database 32 may be incremented each time the data is received."  '609 patent at 13:36-42. Put simply, claim 3 allows for the generic timer to send periodic updates, after which the database increments the stored time value as in claim 2.  This is nothing more than transmitting data and storing updated data, and it too is routine and conventional.  *Affinity Labs*, 838 F.3d at 1262 (generic storing and transmitting limitations did not provide an inventive concept).

### 3.    Uniloc Has Failed to Plead Facts Sufficient to Defeat a Motion to Dismiss the '609 Patent

Uniloc fails as a matter of law to demonstrate the presence of anything inventive in the claims of the '609 patent.  As discussed above, the claims focus on measuring the elapsed time of a media presentation.  But the patent has little to say about solving any technological problems with measuring elapsed playback. Rather, both the Complaint and the specification describe the problems posed by prior art search engines, and suggest that the claims may provide some nebulous advantages over them with puffery regarding "tabular tracking" and the recording of advertising views.  FAC ¶¶ 84-88.  But the claims of the '609 patent contain no search or retrieval functionality for the user.  *Compare* FAC ¶ 84 (identifying search engine inability to use digital media tracking to update search results) and '609 patent at 1:55-2:9 (Background of the Invention) *with* '609 patent at 14:17-49

-10-

(claims 1-3, which include no discussion of search functionality, let alone changes in search results based on tracking).  Nor does the Complaint provide an explanation for the apparent non-sequitur of its connection of search engine indexing and language parsing with user tracking, or explain how tracking a user's viewing of a presentation could affect a search engine's results.  FAC ¶¶ 87-88.  Similarly, the Complaint describes the patent as providing a "technological solution to the problem" (FAC ¶ 86)—but the claim itself provides no technical solution or novel arrangement to solve any problem, instead relying on generic components performing their routine and conventional functions.  The same is true with respect to Uniloc's emphasis of the specification's sparse description of "tabular tracking" and the purported ability to record what ads a viewer watched or listened to, and for how long—the claims say nothing of such an ability.  Even if the patent's specification adequately disclosed an inventive concept in the specification—it does not—the failure of the claims to embody that concept is fatal.  *See, e.g.*, *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 ("The main problem that [patentee] cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept); *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves.").

Uniloc is clearly attempting to manufacture a fact issue where none exists.  Uniloc baldly asserts what "a person of ordinary skill in the art would understand."  For instance, Uniloc asserts that such a person would understand the advancement that a user can stream a presentation between different computers "from the same point no matter where the user left off"—blatantly unrelated to the digital media tracking problems described in the patent.  (FAC ¶ 89).  Similarly, Uniloc simply quotes from the patent in asserting that a skilled artisan would understand "that claim 1 of the '609 patent is directed to a method for providing and tracking digital

media presentations using a web page, identifier data and a timer applet originating at a first computer system to track and responsively stream a digital media presentation from a second computer system that can be viewed by a user at the user's computer," which it describes as "an inventive concept" without explaining why it is inventive.  (*Id.*)  These assertions should be given no weight, as they are conclusory statements with no factual support.  *Uniloc USA*, 2018 WL 3008870, at *9 (conclusory statements that elements are not conventional need not be credited by the court).  Regardless, patent eligibility is a question of law, and on the facts of this case a finding on ineligibility is proper.  *Voit Techs., LLC v. Del-Ton, Inc.*, No. 2018-1536, 2019 WL 495163, at *1 (Fed. Cir. Feb. 8, 2019) (patent eligibility is a question of law that *may* or *may not* contain underlying issue of fact); *see also Iqbal*, 556 U.S. at 678; *Fayer*, 649 F.3d at 1064.

Lastly, Uniloc's superficial allegations regarding Netflix patents are irrelevant.  FAC ¶ 90.  Roku has not taken the position that all patents related to suspended playback are ineligible, only that the '609 patent is ineligible.

## B.  The '118 Patent Claims Patent-Ineligible Subject Matter

The '118 patent is directed to "encoding and decoding image data"—the same abstract idea at issue in *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326-1327 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 672 (2018).  The '118 patent proposes the use of conventional encoding techniques to reduce bandwidth.  The specific steps in the claims of the '118 patent recite known and conventional activity.  The claims thus lack an inventive concept to transform them into patent-eligible subject matter.

The '118 patent issued on May 17, 2005.  The patent relates to a known encoding technique whereby certain blocks (*i.e.*, portions) of a video frame are intentionally dropped if the receiver will be able to generate a close-enough approximation for the blocks without actually receiving them.  The '118 patent begins with a discussion of a 1999 article by W. Zeng and B. Liu that describes this

-12-

1  very technique.  '118 patent at 1:14-32.  The '118 patent both suggests and claims

2  practicing this known encoding method using a conventional, standards-based

3  tool—resynchronization markers.

4      Claim 1 recites three steps: (1) an estimation step, (2) a decision step, and

5  (3) a step of inserting a resynchronization marker.  *See* Claim Listing at 2.  The

6  specification concedes that, of these three steps, the first two are "known from" the

7  Zeng article.  *Id.* at 1:5-18.  Thus, inserting a "resynchronization marker" is the

8  only purportedly inventive step.  Claim 1 is the only claim asserted in Uniloc's

9  complaint.  FAC at ¶¶ 67, 74.

10              **1.      The '118 Patent is Directed to an Abstract Idea**

11      The '118 patent is directed to the abstract idea of encoding and decoding

12  image data.  As noted, the Federal Circuit deemed this same idea abstract in

13  *RecogniCorp*:

14          Morse code, ordering food at a fast food restaurant via a numbering

15          system, and Paul Revere's "one if by land, two if by sea" signaling

16          system all exemplify encoding at one end and decoding at the other

17          end.

18  855 F.3d at 1326; *see also id.* (claimed method "reflects standard encoding and

19  decoding, an abstract concept long utilized to transmit information").  Similarly, in

20  *Digitech*, the Federal circuit found method claims to be abstract where they

21  "describe[d] a process of organizing information through mathematical correlations

22  and [were] not tied to a specific structure or machine."  *Digitech Image Techs., LLC*

23  *v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014).  "A process that

24  started with data, added an algorithm, and ended with a new form of data was

25  directed to an abstract idea."  *RecogniCorp*, 855 F.3d at 1327 (citing *Digitech*, 758

26  F.3d at 1351); *accord. 3G Licensing, S.A. v. Blackberry Ltd.*, 302 F. Supp. 3d 640,

27  652 (D. Del. 2018) (claims reciting only "data manipulation steps" are abstract).

28      Just as in *RecogniCorp* and *Digitech*, the '118 patent is directed to an

-13-

encoding scheme that applies a simple algorithm to manipulate data.  The algorithm is essentially: (1) drop blocks that are dispensable, (2) insert markers where the blocks were dropped.  '118 patent at 2:1-10; *see also* Claim Listing at 2.  As in *RecogniCorp*, the goal of the encoding is to reduce bandwidth.[2]  And, as in *Digitech*, the method claims here are not "tied to a specific structure or machine."  758 F.3d at 1350.

Claim 1 is representative because the remaining claims are similar and linked to the same abstract idea.  *See Cleveland Clinic*, 859 F.3d at 1360.

## 2. The '118 Patent Lacks an Inventive Concept

### a. Claim 1

As mentioned, the first two steps in claim 1—the "estimation step" and "decision step"—are admittedly "known."  Indeed, the '118 patent specification begins by reciting a coding method with the same two steps verbatim, and then stating that "***a coding method of such type is known***" from the Zeng article.  '118 patent at 1:5-18.  The specification further states that the "capacity CAP(MB) of the macroblock[] to be reconstructed by an error concealment method" (*i.e.*, what gets estimated in the "estimation step") may be determined "by very diverse means that are known to one skilled in the art."  *Id.* at 2:64-66; 3:29-31; *see also generally id.* at 2:66 - 3:36 (discussing particular means for making the claimed estimation).  The block's capacity to be reconstructed drives a simple decision of whether to drop the block in the claimed "decision step."  *Id.* at 3:37-49.

To undermine the admission that the first two steps were "known," Uniloc characterizes Zeng's method as having been invented "[j]ust prior to the invention of the '118 patent" and "then novel."  FAC ¶ 52.  These allegations are wholly unsupported.  The '118 patent itself does not characterize the Zeng method as novel

---

[2] 855 F.3d at 1324 ("The '303 patent sought to solve this problem by encoding the image at one end through a variety of image classes that required less memory and bandwidth, and at the other end decoding the images.").

as of June 1999.  And the 1999 Zeng article was published nearly two years prior, not "just prior," to the '118 patent's March 2001 French priority application. Moreover, the French prior art search report for the '118 patent's foreign priority application identifies as relevant an earlier 1996 article by Zeng titled "Rate Shaping by Block Dropping over Transmission of MPEG-Precoded Video Over Channels of Dynamic Bandwidth."  *See* Roku's Request for Judicial Notice ("RJN"), Exhibit 1.  That 1996 article mentions, for example, that "[s]ince many of the blocks can be reconstructed faithfully at the receiver, we consider them as unimportant, therefore drop them if rate reduction is needed."  RJN, Exhibit 2 at pg. 386.  Accordingly, dropping blocks based on their capacity to be reconstructed at the receiver was clearly not novel or inventive in June 1999 as Uniloc asserts, let alone March 2001.

The third and final step in claim 1 involves "inserting a resynchronization marker … after the exclusion of one or more macroblocks."  *See* Claim Listing at 2. But resynchronization markers were also well-known and conventional at the time of the patent filing.  Indeed, the specification introduces resynchronization markers with reference to their use in the MPEG-4 standard.  *Id.* at 1:38-41 ("Among these tools the MPEG-4 standard proposes tools for resynchronizing the binary data stream which periodically insert resynchronization markers into the data stream."). Further, the specification confirms that the claimed markers can be "conventional":

> Here, the term ***"synchronization marker" must be interpreted generally to include***, for example in the MPEG-4 standard, such ***conventional markers*** as RESYNC, VOPStart (start of a temporal instance (plan) of a video object), GOVStart (start of a group of temporal instances of a video object), EOS (end of video session).

*Id.* at 4:35-41.

Uniloc's own infringement allegations for the '118 patent suggest that the claimed use of resynchronization markers is much older than the MPEG-4 standard.

-15-

Uniloc's infringement theory for the '118 patent is based on support for "skipped macroblocks" in the H.264 video standard.  *See* FAC ¶ 71-73.  Uniloc alleges that a flag indicating a skipped macroblock provides the claimed resynchronization marker.  *Id.* ¶ 73.  But skipped macroblocks have been supported at least since the 1993 MPEG-1 standard.  *See* McKeever Decl., Ex. F at pgs. 37-38.[3]  In MPEG-1, the presence of skipped macroblocks were similarly indicated to the decoder in the bitstream.  *Id.* ("skipped macroblocks … are indicated when the macroblock_address_increment is greater than 1"); *see also id.* at pg. 93 (Skipped macroblocks "are coded by having the macroblock address increment code skip over them.").  Uniloc's contention that the claimed resynchronization marker covers a feature standardized at least eight years before the filing of the '118 patent's priority application removes any doubt that the feature is not inventive.

A claim requirement to insert a "conventional" marker does not provide the inventive concept necessary to transform the claim into a patent-eligible invention. *See Mayo*, 566 U.S. at 73 ("well-understood, routine, conventional activity previously engaged in by researchers in the field" are insufficient to provide "inventive concept").  Nor is it sufficient that the claims limit the abstract idea by requiring use of a specific tool, *i.e.*, resynchronization markers.  *See, e.g.*, *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1328–29 (Fed. Cir. 2017) (requiring use of XML tags for claimed search index was akin to limiting the abstract idea to one field of use and not inventive).

Nothing in claim 1 of the '118 patent describes, or even alludes to, any technical improvement.  The claim merely combines known encoding techniques and conventional tools, with nothing to transform the claim into something "significantly more." *See Mayo*, 566 U.S. at 72-73.  Accordingly, the claim lacks

---

[3] As discussed below, the MPEG-1 standard is incorporated by reference into the '005 patent.

the inventive concept necessary to transform the claim into a patent-eligible application.

### 3. Uniloc has Failed to Please Facts Sufficient to Defeat a Motion to Dismiss the '118 Patent

Uniloc asserts that "claim 1 of the '118 patent contains the inventive concept of using resynchronization markers after the exclusion of a macroblock rather than replacing macroblocks with constant blocks, black blocks or bits allocated to communicate the address of the excluded block." FAC ¶ 63. Summarily labeling the use of admittedly conventional resynchronization markers "inventive" does not make it so, and the Court should ignore this legal conclusion couched as a factual allegation. *See Iqbal*, 556 U.S. at 678; *see also Uniloc USA*, 2018 WL 3008870 at *9 (conclusory statements that elements are not conventional need not be credited by the court). As discussed, resynchronization markers were standard-based tools for enabling decoders to recover when video data was not received. Indicators for skipped macroblocks, which Uniloc alleges satisfy the '118 claims, were also conventional and standardized well before the '118 patent. The use of conventional tools in accord with their intended purpose does not supply the necessary inventive concept to make the claims patent-eligible.

Lastly, Uniloc's superficial allegations regarding Netflix and Hulu patents are irrelevant. FAC ¶¶ 64-65. Roku has not taken the position that all video coding patents are ineligible, only that the '118 patent is ineligible.

### C. The '005 Patent Claims Patent-Ineligible Subject Matter

The '005 patent relates to the field of encoding data which the Federal Circuit has deemed abstract. *See RecogniCorp., LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (referring to "standard encoding and decoding" as "an abstract concept long utilized to transmit information").[4] The '005 patent is ineligible because it

---

[4] *See also id.* ("Morse code, ordering food at a fast food restaurant via a numbering system, and Paul Reverse's 'one if by land, two if by sea' signaling

-17-

1   attempts to claim the idea of concurrent motion estimation.  Importantly, the '005

2   patent does not purport to cover motion estimation itself, which it admits was well-

3   known and standardized.  Concurrent motion estimation is abstract, however, and

4   Uniloc's attempt to claim that idea regardless of how the idea is implemented is

5   impermissible.  Patents are not awarded for abstract ideas untethered from a

6   concrete invention that actually achieves them.  The claims of the '005 patent add

7   nothing inventive to the abstract idea itself and are therefore ineligible.

8        Motion estimation is a well-known video compression technique that was

9   used for decades before the '005 patent.  '005 patent at 1:40-55; 2:49-54.  Indeed,

10  the patent references "conventional methods of motion estimation."  *Id.* at 3:54.

11  Motion estimation helps reduce the data required to represent a frame in a video by

12  identifying similar portions from another frame for reuse.  '005 patent at 2:49-54.

13  The technique involves comparing pixels in one picture "to those of a previously

14  transmitted reference" picture to find a match.  *Id.* at 1:45-51.

15       In motion estimation, there are different "prediction modes" which

16  correspond to different approaches for finding matches in a reference picture.  *Id.* at

17  3:7-24.  The MPEG-2 standard defines six prediction modes.  *Id.* at 3:7-9; 4:22-26.

18  The '005 patent admits that "[c]urrently known methods of motion coding allow the

19  use of different prediction modes," and that it is often possible to determine in

20  advance which mode will produce the best match. *Id.* at 3:12-20.  The patent asserts

21  that sometimes the optimal prediction mode is not known, however, and trying

22  multiple prediction modes is impractical because each one requires substantial time

23  to try.  *Id.* at 3:15-24.  The '005 patent proposes a simple but abstract solution—

24  perform motion estimation for multiple prediction modes ***concurrently***.

25       **1.    The '005 Patent is Directed to an Abstract Idea**

26       The '005 claims are directed to the abstract idea of concurrent motion

27  _____

28  system all exemplify encoding at once end and decoding at the other end.").

-18-

estimation.  The '005 patent's purported "advance over the prior art" is not motion estimation which it admits was known, but rather ***concurrent*** motion estimation. *See Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter.").  The motion estimation itself is secondary and preferably follows established standards.  '005 patent at Abstract ("In one embodiment, the method and device are capable of concurrently determining [sic] performing motion estimation in each of the six different possible prediction modes specified by the MPEG-2 standard.").[5]

The abstractness of the '005 claims is underscored by the absence of anything that restricts how the claimed concurrent motion estimation is achieved. The '005 patent claims the abstract idea of concurrent motion estimation as a result, rather than claiming a particular means of achieving that result.  *See Two-Way Media,* 874 F.3d at 1329 ("Under *Alice* step one, … [w]e look to whether the claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery.") (citation omitted); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) (noting the "important common-sense distinction between ends sought and particular means of achieving them, between desired results (functions) and particular ways of achieving (performing) them").

In *Interval Licensing LLC v. AOL, Inc.*, the Federal Circuit recently affirmed an order granting judgment on the pleadings where the claims-at-issue were similarly directed to an idea rather than a concrete solution.  896 F.3d 1335 (Fed. Cir. 2018).  There, the patent claimed "an attention manager [that] makes use of

---

[5] *See also, e.g., id.* at claim 42 ("wherein the prediction modes include at least a plurality of the prediction modes specified by the MPEG-2 standard").

'unused capacity' of a display device, by displaying content in that unused capacity."  *Id.* at 1338 (citing patent) (internal quotation marks omitted).  At *Alice* step one, the court noted that "[s]tanding alone, the act of providing someone an additional set of information without disrupting the ongoing provision of an initial set of information is an abstract idea."  *Id.* at 1344.  The court mentioned the familiar example of a breaking news ticker on the bottom of a television screen.  *Id.* That the claims recited an "attention manager" did not make them non-abstract where the term "simply demands the production of a desired result (non-interfering display of two information sets) without any limitation on how to produce that result."  *Id.* at 1345.  The court deemed the claim abstract in part because "the claim in effect encompasses all solutions" for producing the abstract result.  *Id.*

Similarly, in *Affinity Labs*, the Federal Circuit affirmed dismissal of a patent with claims directed to the abstract "concept of providing out-of-region access to regional broadcast content."  838 F.3d 1253, 1258 (Fed. Cir. 2016).  The court noted traditional practices such as mailing local newspapers to other areas or using satellites to broadcast sporting events.  *Id.*  Just as in *Interval Licensing*, the court emphasized that the claims were directed to the idea rather than a concrete solution that achieved the idea.  *Id.*  Although the abstract idea could "be implemented in myriad ways[,]" the court found "nothing in claim 1 that is directed to ***how to implement*** the out-of-region broadcasting on a cellular telephone.  Rather, the claim is drawn to the idea itself."  *Id.* at 1258 (emphasis added); *see also id.* at 1262 ("[The patent] claims the general concept of out-of-region delivery of broadcast content …, without offering any technological means of effecting that concept.").

The '005 claims—for example, claim 41—are similarly result-oriented and abstract.  *See* Claim Listing at 3.  The first step of claim 41 generically recites the bare, abstract idea of "concurrently performing motion estimation."  Nothing limits ***how*** concurrent motion estimation is actually achieved.  The remaining steps simply recite selecting and using the best match identified by the concurrent motion

estimation step. "Instead of claiming a solution for producing [concurrent motion estimation], the claim in effect encompasses all solutions." *Interval Licensing*, 896 F.3d at 1345. The claim "is untethered to any specific or concrete way of implementing" concurrent motion estimation. *Affinity Labs*, 838 F.3d at 1258. This is "the height of abstraction." *See Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 Fed. App'x 950, 954 (Fed. Cir. 2017) ("[A] method for collection, analysis, and generation of information reports, ***where the claims are not limited to how*** the collected information is analyzed or reformed, ***is the height of abstraction***.") (emphasis added).

### 2. The '005 Patent Lacks an Inventive Concept

Where a claim is directed to an abstract idea, it must include an "inventive concept, *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217-18 (quoting *Mayo*, 566 U.S. at 72-73) (internal quotation marks omitted). The '005 claims include no such inventive concept.

### a. Claim 41

Claim 41 recites four steps, the first of which recites the abstract idea itself—concurrent motion estimation.[6] The abstract idea itself cannot supply the inventive concept, however. *See BSG Tech LLC, v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept.").

Although the abstract idea here involves motion estimation, motion estimation was routine and conventional when the patent was filed. Indeed, Uniloc

---

[6] Motion estimation is also abstract. The Federal Circuit has "treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category." *Elec. Power Grp.*, 830 F.3d at 1354.

acknowledges that motion estimation was standardized via MPEG-1 and MPEG-2

which the '005 patent describes as the "most widely accepted international

standards" related to video coding and which are incorporated by reference into the

patent specification. FAC ¶¶ 19-20; '005 patent at 1:21-19; *see also* McKeever

Decl., Ex. F (MPEG-1 standard) at pgs. 78-85, Ex. G (MPEG-2 standard) at pgs.

73-87 (both describing motion estimation). Claim 41 would cover performing two

strictly conventional modes of motion estimation as long as they were performed

concurrently. Claim 42, which depends from claim 41, specifies that "the

prediction modes include at least a plurality of the prediction modes specified in the

MPEG-2 standard." Performing motion estimation in accord with "the most widely

accepted" video coding standard is not inventive. *See Mayo*, 566 U.S. at 73 ("well-

understood, routine, conventional activity previously engaged in by researchers in

the field" does not provide "inventive concept").

The three remaining steps of claim 41 are each conventional and simply

describe selecting and using the best result obtained via concurrent motion

estimation. The "comparing" and "selecting" steps require comparing the results

(*i.e.*, the matches) produced by different prediction modes and selecting the best

match. Conventional motion estimation for a single prediction mode involves the

same comparing and selecting steps. *See* '005 patent at 2:54-67 (error metrics for

each possible match are compared and match with the lowest value is selected).

Such conventional comparison and selection are insufficient to transform make the

claim patent-eligible. The "generating" step is also routine as the motion vector is

simply derived from the location of the best match just as in conventional motion

estimation. *Id.* at 2:64-3:4 (the "horizontal and vertical positions [of the best

match] relative to the current macroblock … constitute the motion vector"); *see*

*also id.* at 2:28-31 (noting that the "motion vector(s) … corresponds to the position

of the closest-matching macroblock … in the anchor picture(s)"). "[S]imply

appending conventional steps, specified at a high level of generality, to … abstract

-22-

ideas cannot make those … ideas patentable." *Mayo*, 566 U.S. at 82; *accord.*
*Ultramercial*, 772 F.3d at 716.

### b.    Claim 1

The discussion above focused on claim 41 which is representative.  Other
claims are similar and linked to the same abstract idea of concurrent motion
estimation.  *See Cleveland Clinic*, 859 F.3d at 1360.  For example, Uniloc's
complaint asserts claim 1.  *See* Claim Listing at 3.  Just like claim 41, claim 1
recites the idea of "concurrently performing motion estimation …."  Although the
"comparing …" step in claim 1 recites some additional language about comparing
pixels, that language is redundant because it just describes how to perform
conventional motion estimation by making comparisons between arrays of pixels.
*See* '118 patent at 2:49-54 ("For all MPEG-2 prediction modes, the fundamental
technique of motion estimation consists of comparing the current macroblock with
a given 16-by-16 pixel array in the anchor picture, estimating the quality of the
match according to the specified metric, and repeating this procedure for every such
16-by-16 pixel array located within the search range.").

Just as in claim 41, the remaining steps in claim 1 amount to picking the best
matching block and generating a motion vector for it, both of which are steps
performed during conventional motion estimation.  *See id.* at 2:64-3:1.

### 3.    Uniloc Fails to Plead Facts Sufficient to Defeat a Motion to Dismiss the '005 Patent

Uniloc again falls short in its efforts to manufacture a factual dispute at *Alice*
step two in hopes of surviving a motion to dismiss.  First, Uniloc essentially argues
that concurrent motion estimation is itself the inventive concept.  FAC ¶ 29.  But, as
discussed, concurrent motion estimation is the abstract idea itself, and therefore
cannot by definition supply the inventive concept.  *See BSG Tech*, 899 F.3d at
1290.  Further, concurrent motion estimation cannot provide the inventive concept
when the claims do not even specify ***how*** concurrent motion estimation is achieved.

"[W]hen a claim directed to an abstract idea 'contains no restriction on how the result is accomplished … [and] [t]he mechanism … is not described, although this is stated to be the essential invention[,]' then the claim is not patent-eligible." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) (quoting *Internet Patents*, 790 F.3d at 1348 (alterations in original).

To the extent Uniloc means to suggest that the ***idea*** of "concurrent motion estimation" was new or nonobvious at the time the '005 patent was filed, that point, even if true, is irrelevant.

> We may assume that the techniques claimed are "[g]roundbreaking, innovative, or even brilliant," but that is not enough for eligibility. … The claims here are ineligible because their innovation is an innovation in ineligible subject matter. … [T]he advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm. An advance of that nature is ineligible for patenting.

*SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018).

Uniloc also repeatedly alleges that the purportedly inventive solution of the '005 patent "is simpler, faster, and less expensive than prior art technology." FAC ¶¶ 13, 24, 29. As an initial matter, the Court need not credit such conclusory allegations. *See, e.g., Uniloc USA, Inc. v. HTC Am., Inc.*, 2018 WL 3008870 at *9. Moreover, because the '005 claims recite only the result of concurrent motion estimation as opposed to a specific method for achieving that result, the claims do not ensure that the patented method will be simpler, faster, or less expensive. The claims would cover a very complex, very slow, and very expensive approach as long as it achieved concurrent motion estimation.

Lastly, Uniloc's superficial allegations regarding Netflix and Hulu patents are irrelevant. FAC ¶¶ 30-31. Roku has not taken the position that all video coding patents are ineligible, only that the '005 patent is ineligible.

-24-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 4.   The '005 Patent Preempts All Ways of Achieving Concurrent Motion Estimation

The Supreme Court in *Alice* explained that "the concern that drives" the exclusion of abstract ideas from the broad range of patentable subject matter is "one of pre-emption."  573 U.S. at 216.  Claims directed to abstract ideas "risk disproportionately tying up the use" of those ideas.  *Id.* at 217 (quoting *Mayo*, 566 U.S. at 72); *accord. Le Roy v. Tatham*, 55 U.S. 156, 175 (1852) ("A patent is not good for an effect, or the result of a certain process, as that would prohibit all other persons from making the same thing by any means whatsoever.  This, by creating monopolies, would discourage arts and manufactures, against the avowed policy of the patent laws.").  As a result, the Federal Circuit "has noted that claims that are 'so result-focused, so functional, as to effectively cover any solution to an identified problem' are frequently held ineligible under section 101."  *Affinity Labs v. DIRECTV*, 838 F.3d at 1265; *accord. SAP v. InvestPic*, 898 F.3d at 1167 (discussing "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it").  That the claims of the '005 patent attempt to cover any and all approaches for achieving concurrent motion estimation is a red flag that bolsters the showing above that they are ineligible.

## V.   CONCLUSION

Because the claims of the patents-in-suit fail both steps of the *Alice* framework, Roku respectfully requests that the Court dismiss Uniloc's Complaint with prejudice.

DATED:  March 18, 2019                    **PERKINS COIE LLP**

By: */s/ Patrick J. McKeever*
Patrick J. McKeever
PMcKeever@perkinscoie.com

Attorneys for Defendant
ROKU, INC.

-25-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 18, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

Any other counsel of record will be served by electronic mail.

By: */s/ Patrick J. McKeever*
Patrick J. McKeever

NOTICE OF MOTION AND MOTION TO DISMISS FAC